Please be seated. and I want to welcome you today to the Ninth Circuit Arguments. who is visiting us from Middle District of Florida, and we want to thank him for his willingness to come out to the Ninth Circuit and work with us on our cases. I want to remind counsel that we have read the briefs carefully and are familiar with the arguments, and to please focus your attention on the most important issues and be mindful of your time. And let us know if you have any, if you would like to reserve any time for your rebuttals. We have four submitted cases today. They are Ahmed v. Garland, Case No. 16-72919, Shamim v. Garland, Case No. 17-71181, Gomez Orozco v. Garland, Case No. 17-71836, and Diaz Arroyo v. Garland, Case No. 21-70900. And we also have two cases scheduled for argument today. I will call the first case on the calendar, Zachary Silberscher v. Valiant Pharmaceuticals International Incorporation et al., Case Numbers 20-16176 and 20-16256. Each side will have 15 minutes for argument. Counsel? Thank you, and may it please the Court. My name is Diginder Singh. I'm here for Zachary Silberscher. I'd like to hang on to four minutes for rebuttal, if I can. I'll lead off today with the principal issue the parties have briefed, which is the public disclosure bar question. To hold that the public disclosure bar applies to this claim, this Court has to hold that substantially the same allegations or transactions, as alleged in our complaint, were publicly disclosed in the specific enumerated channels. The defendants here haven't argued, nor could they, that our allegations of fraud have been disclosed. And so the question for the Court is whether the transactions have been disclosed. To answer that question, I think the parties actually agree that the best place to look is this Court's We cite this in our opening brief, and Valiant cites it as well. In Metesky, the Court explained that for a transaction to be disclosed, the public sources must reveal two things, a misrepresented state of facts, and also the true state of facts, so that you can juxtapose those two things and realize that the misrepresented state of facts is, in fact, a misrepresentation. As Valiant explains it in this case, and this is on page 17 of their brief for the first time, and they say it throughout, the misrepresented state of facts here is that the price of the drug Aprizo was fair and reasonable. Now, we think that should more or less resolve this argument in our favor, because there's no public source anywhere disclosing that the price of Aprizo was not fair and reasonable, and the defendants don't say that there is. Instead, their argument is that there are enough other facts strewn about the public records from which one could infer that maybe the price of Aprizo was not fair and reasonable, and that's enough, according to them. But that's a very aggressive reading of the public disclosure bar, and really of the phrase, substantially the same. Well, Mr. Singh, let me ask about the decision by the PTAB. Why couldn't we infer sufficient facts to infer that fraud was committed, at least in the acquisition of the patent, which then could infer the sale to the government? That's for two reasons, Your Honor. The first is that the PTAB decision itself does not disclose important facts about what happened during patent prosecution. So what the PTAB holds is that the 688 patent, the principled patent that is issued here, is invalid because it's obvious. And part of the reason why it's obvious is that there are these two studies, the Bruner and Marikuski studies, that render it so. Now, the PTAB's decision discloses that the patent's invalid. We don't deny that. The PTAB's decision discloses that the Bruner and Marikuski studies exist and were material to patentability, and it even could be read to disclose that Dr. Falk was aware of those studies. But what it doesn't disclose, and this is the key point, it doesn't disclose that the defendants withheld those studies during patent prosecution. And this is a critically important point that the defendants never have an answer to in their brief. They don't explain how one could read the PTAB's decision and reach the conclusion that they hadn't handed over the studies. And I'll just point out, it's not an inevitable conclusion from what the PTAB found. The PTAB all the time— Well, why not? Because as I understand it, one of the co-authors was— or rather, one of the inventors was a co-author of the prior studies. So why—was that something that was referenced in the PTAB decision? So that's not quite right, Your Honor. It's that an employee of Dr. Falk was a co-author of the prior studies. But that doesn't get you to the fact that the studies weren't disclosed. So the PTAB all the time invalidates patents, and it frequently does so on the basis of references that were disclosed during patent prosecution. It just decides, oh, the examiner didn't understand what this reference meant. You know, we disagree with the examiner's determination about what this reference— the significance of this reference. But the PTAB decision actually doesn't tell you that the defendants had never disclosed those studies during patent prosecution. And so even vis-a-vis those studies, it doesn't do anything. But I have a better point, if that one is not moving the needle all the way for you, which is that we've pointed out an entirely separate set of misrepresentations. These are misrepresentations relating to other facts in the defendant's possession about the efficacy of meslamine drugs when taken either with or without food. And we've talked about these. You'll find this stuff starting on page 163 of the excerpts of record when we talk about all the misrepresentations. We talk about the Bruner and Merikuski studies, and then we talk about these separate misrepresentations. So when the defendants prosecuted a separate patent, the 344 patent, they tried to convince the patent office that it was actually really inventive to take meslamine drugs with food. That's the opposite of the position they took when they prosecuted the 688 patent. And in connection with that 344 patent, they said, hey, we did this research. And these are not the Bruner and Merikuski studies. This is entirely separate research. They said, we did this research. And what the research shows is that the colonic bioavailability of meslamine, that means the efficacy of the drug, actually goes down when you take it with food. And so that is very unexpected. And so they basically said one thing with the 344 patent and the opposite thing with the 688. But in connection with the 344 patent, they named three other pH-dependent meslamine drugs, Lealda, Clavrasol, and Esacol. And they said for all of these, it's amazing. Food causes the bioavailability to decrease, and that's so surprising. Now, if they had told that to the patent office when they prosecuted the 688 patent, it would have fatally undermined their argument that actually taking it without food is the inventive new idea. Let me switch gears for a moment. As I understand it, there are a second set of patents called the Otterbeck patents that are separate and apart from the 688 patent. And as I understand it, they would have independently protected APRESA apart from the invalidation of the 688 patent. Why wouldn't that defeat the False Claims Act claim if there isn't any showing or sufficient showing of materiality or science with respect to those other set of patents? Sure. So I think that the presence of the Otterbeck patents and their effect really only goes to the amount of damages and not anything else. The Otterbeck patents themselves were due to expire in 2018, and so there have been ongoing claims after them. So those couldn't have affected those. But even as to before then, as we pointed out, generics were poised to enter the market much earlier. I believe the first applications for generic entry were in either late 2011 or early 2012, and the defendants sued. And so the generics were coming in and challenging the Otterbeck patents. The Otterbeck patents are exceedingly weak. They would have fallen is our allegation, and we can prove that if we have to down the line. And so our argument and our allegation is that actually generic entry would have occurred much earlier than the expiration of the Otterbeck patents because probably by 2014 at least, those patents would have failed and generics would have been issued there. But that's the problem, as I see it, is I don't know that the allegations in the complaint are sufficient to allege the invalidity of the Otterbeck patents. And if that's the case, then you don't have a False Claims Act claim because there is no causal connection between invalidating the 688 patent and the government being charged higher prices. In other words, even if you took out the 688 patent, isn't it the case that the Otterbeck patents would independently protect APRESA and the government would not therefore have been paying unreasonable prices for it? Your Honor, even if you take that argument at face value, it's only true until those patents expire in 2018. The 688 patent is the only patent that goes beyond that date further until it was invalidated. But why does that matter because 688 was already invalidated? The Otterbeck patents have expired. Are you claiming that you have a False Claims Act over prospective damages that haven't occurred by government payment? Yeah, that's right. The meter keeps running on these claims, Your Honor. And so, you know, had there been those – so first of all, our argument is had there been those 688 patents, the Otterbeck patents would have failed earlier. Now, we do think that there are sufficient allegations in the complaint to say the Otterbeck patents are invalid and would have failed. Those allegations begin on page 170 of the excerpts of record. And we specifically, I think, say that the Otterbeck patents wouldn't have survived the challenges that the generics were bringing against them. And so, you know, for now, I think you have to take that allegation as true. The defendants certainly have not argued. Not if it's conclusory. Not if you've only given a conclusory statement as to Scienter or as to the basis for asserting that the patents are invalid. As I recall, the complaint only mentions one of those six patents and only one claim within one of those patents. So I'm having a hard time seeing how those allegations are sufficient to plead the invalidity of the Otterbeck patents. So, I mean, Your Honor, I don't think the allegations are conclusory. We have about a dozen paragraphs where we talk about the specific claims in the Otterbeck patents, why they had been identified in the prior are already and therefore why they wouldn't have survived the challenge. And also it's telling that in their actions against the generics, the defendants themselves gave up on the Otterbeck patents. They said, OK, we're not going to pursue those claims against you all. And these are not defendants who give up easily. And so I think that there is something to be read into that as well. When you think about whether this allegation is plausible at the pleading stage. Now, I agree they can interpose this as a causation defense. But I think for purposes of the pleading stage, describing these allegations as conclusory is a bridge too far. I understand your argument that there's an inference to be made as a result of the settlement. But you didn't respond to Judge Sanchez's question to the extent that the complaint refers only to one of the multiple, I think, five claims. In the Otterbeck patents? In the Otterbeck, yeah. So I think that what the complaint does is it says the claims in the Otterbeck patents that were protecting Aprizo were subject to successful challenge. And that's what matters for present purposes. I don't think it matters. Does that satisfy Iqbal? Is that a sufficient pleading? But, Your Honor, I'm summarizing it here. But the complaint doesn't just say that. It goes through and explains that the Otterbeck patents wouldn't have succeeded and describes why. And I think that that allegation taken as sufficient. So if the question is just do we have to take that allegation as sufficient, I guess what I'd say is the defendants haven't really put forth an argument for why not. And in any event, that is completely peripheral to the public disclosure bar question. And so if there's a question about that, I suppose maybe the right answer would be to resolve it on remand. But I think that there is, in my view, certainly a relatively robust allegation that these patents were not going to be upheld against challenge. So going back to the public disclosure bar, you were speaking about substantial similarity. Talk about the appropriate channels in your view as to whether an administrative agency proceeding is one of those enumerated channels under the 2010 Amendments to the False Claims Act. Yes, Your Honor. We think administrative proceedings are an appropriate channel for disclosure, but only when the government is a party. The defendants forfeited the argument below that the government is a party to IPRs, and they argued solely that it doesn't matter. We think it does matter. We think the structure of the statute makes it quite clear that it matters, because Congress consolidated all administrative proceedings in the first Romanette, and it only has other federal hearings in the second Romanette. And two courts now have gone through this reasoning and agreed with us. That's the Janssen Court in the District of New Jersey and the Northern District of California in the Allergan case, which is also currently on appeal before this court. Excuse me, Counsel, but this is Judge Schroeder. What does other federal hearings mean? It means, Your Honor, hearings that are not civil, criminal, or administrative. And so congressional hearings would be a good example, and there could be, you know, other hearings in other parts of the government. You know, congressional hearings is expressly named, but it gives you an idea of what other means. It means something other than what's in the first prong. And if that were not so, then every civil case in a federal court, regardless of whether the government is a party, would be swept in, which just simply cannot be true. It would render the entire first prong of the statute superfluous. Well, let me ask about that, because the Supreme Court in Schindler-Elevator, which I understand was interpreting the law before the amendments, but when it issued its decision, the Supreme Court broadly construed the public disclosure bar. So it thought of the bar as a broad one. And I take it your assertion is that the congressional amendments in 2010 radically shifted that bar and significantly narrowed it so that federal, criminal, civil, and administrative is meant to be exclusive within that little Roman I. And anything else can't be one of those. And other federal hearings can't be one of those three categories. Is that the argument? That is the argument, Your Honor. And just to reconcile that with Schindler-Elevator, you know, I think what the court says in Schindler-Elevator is we're going to interpret the statute according to its plain text. And some of the terms in the plain text suggest breadth. And we're not going to deviate from the plain meaning of the text unless context suggests otherwise. Then Congress comes along and amends the statute. And we think the amendments clearly suggest that there needs to be an adjustment to the understanding of what counts as a hearing in prong two, when hearings are very specifically dealt with in prong one to explicitly carve out certain hearings. Or just to put it very simply, prong one, I don't think anyone would deny, deals with a subset of federal hearings. If prong two also says all federal hearings are included, then prong one is doing no work. And we think that under the Supreme Court's settled method for statutory interpretation emphasized over again in Schindler-Elevator, there is no way to do that. You can't read a statute to render a subpart superfluous, especially when, as here, that subpart is the subject of congressional amendment designed to accomplish a particular goal. Thank you, counsel. I see I'm quite over time. Thank you. Good morning, Your Honors. Moaz Kaba for Valiant Health Pharmaceuticals, may it please the court. I'd like to start where the panel just ended on the enumerated channels. And what what the the relator appellant here is urging is precisely what the Supreme Court and the Ninth Circuit has said one should not do with the public disclosure bar. That is, read words into the bar that are not in the statute as they currently exist. So Judge Sanchez, you asked about Schindler-Elevator. Schindler-Elevator, of course, was actually came after the statute was amended. It certainly was interpreting the pre 2010 bar, but the opinion was issued in 2011. So Congress was not responding to Schindler-Elevator when it had amended the statute. And Schindler says that the Supreme Court cautions against interpreting the public disclosure bar in a way inconsistent with the plain reading of the text. And repeatedly, any time individuals have argued to read words into the text that are not there to say this, the enumerated channels must mean something other than the words written on the page. So in Graham County, the notion was administrative as used in the pre 2010 bar had to mean federal administrative. The court said, no, that's not what it says and that's not how we're going to read it. In the Ninth Circuit's decision in Bennett v. Biotronic, the argument was that the government action bar could only apply where the government was presently a party. The Ninth Circuit again says, no, we are not going to read words into the statute. The fact that Rome Nat 2 says other federal hearing or report certainly cannot mean anything than federal hearings, which the court, the Supreme Court and the Ninth Circuit have repeatedly said are federal proceedings generally or federal reports. It can't mean congressional because congressional is already an enumerated channel. And the notion this this fear of redundancy is is a point that the Supreme Court and again the Ninth Circuit have already factored in. They they both have said over and over again that there will be some redundancy. Well, Mr. Crabaugh, some redundancy I could imagine. But if if one were to take the lower court's position here where other federal hearing could mean any administrative agency proceeding, how does that not swallow up the Roman one where the government is a party to to counsel's point? It would do that clause would do no work. Isn't that right? I don't I don't know that that is necessarily right. Your Honor, I don't think that's the issue presented at the moment. The question is for this court is is a PTAB proceeding and an IPR that issues there from a federal hearing or a federal report? It isn't it isn't just any and every administrative hearing. It has to be a federal one. In fact, one could read Roman at two as a response to the Supreme Court's decision in Graham County, where the Supreme Court said the prior use of administrative could cover state and remote local proceedings. Congress came in in 2010, amended the statute. They know we are only talking about federal hearings, federal reports. Your Honor, with with with the the caution that relator is relaying to you is if not, if if a PTAB proceeding is not a federal hearing, if an IPR is not a federal report, then we are reading in. And this panel is reading in a government party limitation into Roman at two that Congress plainly did not include when it amended the statute. And so what we are dealing with here is not just one enumerated channel. We are dealing with enumerated channels across the board. It is the PTAB proceeding, the IPR hearing, the law. Three is the government of a party to congressional hearings. Your Honor, I think the argument I don't think that question has been answered. But I don't know that it it needs to be because congressional hearings are already identified as an enumerated channel. So a congressional hearing, an inquisitory function, you know, we we were we were speaking earlier about the hearings that we've been watching yesterday. There there is not necessarily a party to to a congressional hearing because it's gathering of information and evidence. And so, Your Honor, I would say that because, as the Supreme Court said in Graham County and in Schindler, the touchstone of the public disclosure analysis is the fact of public disclosure. It is it would strain the statute and the court, this court's guidance to say we are going to read words into Roman at two to prevent a PTAB proceeding or an IPR to from being an enumerated channel of disclosure. And of course, here, Your Honor, we we also have the law 360 article that attached the PTAB proceeding and in Schindler Elevate. I'm sorry, the IPR decision and in Schindler Elevator. In that opinion, the court said that when you attach something to an enumerated channel, it is itself a part of the public disclosure. I'm limited on time, so I wanted to shift to the second question that the court answers. Excuse me, just one more. I'm trying to understand what this means. So a state legislative hearing. What? How would that be treated? Your Honor, I think under Roman at two, a state legislative hearing would not be covered anymore in in the pre 2010 bar. I believe it would have because of the use of administrative hearing, et cetera. But now, because it's federal, it must be a federal proceeding. But just following up, if if the changes circumscribe the scope of FCA public disclosure bar to federal matters, federal hearing, congressional GAO, what have you. I still don't see how where the government is a party makes any sense. If any federal administrative hearing would encompass the public disclosure bar. What is the point of Congress having added the words where the government is a party if your reading of Roman to swallows up all of those instances? Well, Your Honor, there there may be scenarios in a state court proceeding. No, but we're just we're just talking about federal. So the scope, the consistency of the amendments are to make it federal matters in both one and two. So within the federal scope, how can just any administrative or PTA proceeding be a disclosure? What work is where government is a party? But how is that phrase to be given meaning under your interpretation? Well, in our view, Your Honor, there will be federal a federal civil proceeding in which a lot of discovery is being exchanged, for example, in which depositions are occurring, in which interrogatories are being responded to. In that case, prior to the amendment of Roman at one, the government could could be held to have the knowledge constructively of the things that are being disclosed in that proceeding. Now, it is not now the government must be a party. So if there's an interrogatory response out there that discloses some material information, it's only going to qualify if the government is a party. But when you get to Roman at two and you get to federal hearings or federal reports, generally the presumption is under the Supreme Court's jurisprudence that that the federal government presumably is going to know or at least have sufficient access to information that is being disclosed in federal hearings. And I would go back, Your Honor, to Graham County. I understand it was the pre 2010 bar, but that decision came out in 2010. And in that case, Your Honor, the Supreme Court took for granted that federal proceedings, federal administrative proceedings, of course, qualify under the public disclosure bar under the then current version of Roman at two, which was virtually identical, except for it referred to administrative rather than federal, as it does now. And I think that that guidance is in is instructive here. If the Graham County court is telling us that everyone agrees that a federal administrative proceeding is sufficient to qualify under the public disclosure bar at a time when the statute didn't even refer to federal proceedings. And now the statute is expressed that federal proceedings qualify. So I think that whether it is the PTAB proceeding and we would argue that the government is a party to a PTAB proceeding under under federal circuit law, even if the government is not a party, a PTAB proceeding and an IPR and the pair database are all enumerated channels under Roman at two. And then, of course, we have the law 360 article and the very studies upon which the appellant bases his case, the Bruner and Markowski studies, which are all considered new sources under what everyone agrees is the broad construction of Roman at three of new sources. Let me quickly ask you before time runs out about the Otterbeck patents and if if if those remained valid during this time period, would there still be a False Claims Act claim? Go ahead. Your Honor, it's it's it's exactly, of course, one of the many problems with the complaint is the complaint alleges that, as your honor was indicating, the two the six eight patent was invalidated in twenty seventeen. The complaint alleges the Otterbeck patents were remained good patents until twenty eighteen. Now the complaint can say kind of with the brush of the hand. I have these six patents. They also could have failed, but that does not make a False Claims Act. The the the supposition, the speculation that other patents may have failed if some other series of events would have occurred does not mean those patents did fail. Those patents continue to protect appraisal. And what your honor is getting at is a very important point that covers both the falsity and the materiality prongs. You cannot say I'm going to attack one of seven patents protecting a drug, say that one failed and there was withholding of information. However, these other six, we're not going to we're not going to bother with them. I'm just going to tell you in my complaint, I think they also would have failed. Well, you don't have sight. I couldn't find this argument in the in the briefs. Is it there? Did you make that argument? Your honor, we make the we make the the materiality argument in our briefs and we made it before the court below. And as your honor knows, the court can affirm on on any basis. The materiality point that we make is actually come straight from the plaintiff's complaint and Escobar, namely that if in Escobar, the Supreme Court says that if the government continued paying, notwithstanding the actual event alleged in this case, the the invalidation of the 688 patent, then that is very strong evidence that can be used at a motion to dismiss to dismiss the claim. And here the complaint alleges the government continued to pay. Well, that's a pretty, pretty, pretty indirect reference to a contention that the Otterbeck patents would sustain your position. But your honor, I would say I would submit to you that because it's you are looking at the complaint as a whole, as the district court had to the district court, of course, address the Otterbeck patents and said, I can't even make heads nor tails of what plaintiff is claiming about these Otterbeck patents other than they existed to protect the drug. Our argument on appeal, your honor, I certainly agree was not as precisely targeted. Your argument would be that it wasn't wasn't really alleged either. So it wasn't it wasn't alleged. And plainly, the the government continued paying, notwithstanding the 688 patents invalidation, which may have been because of the six other patents. It may have been because the government thought that these were, in fact, fair and reasonable prices. I'm happy to answer any I understand. I didn't I didn't get back to the substantial similarity point. But I would submit as the court has read the briefing. So lease Hong all go to this point on why the specific fraud does not need to be alleged as long as it can be inferred from the facts alleged, which plaintiff and it's the appellant in his own brief admits the way he got this claim is by looking at the proceedings and the studies. OK. Counsel, you're arguing on behalf of Dr. Falk. That's right, your honor. Chris Mammon on behalf of Dr. Falk Pharma. Our position here is is simple, and that is that Dr. Falk Pharma does not belong in this litigation. The first reason is that the the complaint fails to state a claim for all the reasons that Mr. Kaba has has just explained. The second is that there is no valid claim as to Dr. Falk Pharma for the reasons set forth in Section 8C of our principal brief. The the allegation Dr. Falk Pharma is lumped in with allegations against defendants, even when those allegations plainly and on the record do not apply to Dr. Falk Pharma. Third, Dr. Falk Pharma is not subject to personal jurisdiction on this claim. And then finally, the federal circuit has exclusive jurisdiction over this appeal. I'd like to spend my time focusing on these two jurisdictional issues. On the issue of appellate jurisdiction, under the Supreme Court's ruling in Christensen, Silberscher's claim against Dr. Falk Pharma necessarily depends on resolution of a disputed and substantial question of patent law. And under the Zeitronics line of cases, it appears that the Supreme Court's subsequent ruling in Gunn v. Minton has elevated the substantiality analysis to something beyond just a mere yes or no question. And I'll get to that in a moment. But here, both the necessity and substantiality factors are met. The necessity element is met as to Dr. Falk Pharma because Silberscher's only theory against Dr. Falk Pharma is premised on Falk's allegedly fraudulent nondisclosure for the U.S. Patent Office. Well, counsel, let me ask you this. Under Zeitronics, the federal circuit construed a substantial question as to whether a patent claim might be revived or affected. And here, I don't see that. The 688 patent the federal circuit already concluded is invalid. And the Otterbeck patents have been revival. So why does this contemplate a substantial question that would require federal circuit jurisdiction? So it is a substantial question because in the prior IPR and prior litigation, only two of the 16 claims in the 688 patent were invalidated. Under the Patent Act, invalidity is determined on a claim-by-claim basis. The 688 patent has 16 claims, and only two of those were invalidated and that are not set to expire until 2030. And so, therefore, the reasoning in Zeitronics 2 out of the Fifth Circuit is directly on point here as to all defendants. But there's even more as to Dr. Falk Pharma, which is that Falk was the assignee of the patent for a portion of the time that the patent was being prosecuted. But it was Salix who prosecuted the patent. The individuals who are identified, the prosecuting attorney and the two inventors, are affiliated with Salix. Nobody, neither Dr. Falk Pharma nor anybody affiliated with Dr. Falk Pharma, had any duty of disclosure to the patent office under existing patent law doctrine. Does that matter if, and I take your point, but if Dr. Falk was involved in licensing the patent and pressing claims against others, generics, as to its validity, wouldn't it be sufficient to make, state out an FCA claim on the basis of knowledge or reckless disregard of information as to the patent's invalidity? If this Court were to hold that that breadth of information is sufficient to establish unenforceability or fraud before the patent office, that is a doctrine, that is a theory of fraud before the patent office that has never before been recognized. Even under Walker Process Antitrust, the case law is very clear that that tracks the inequitable conduct doctrine. So if this Court were to hold that someone in the position of Dr. Falk Pharma is subject to a duty of disclosure and should have disclosed things to the patent office, that expands Not to the patent office, but in Dr. Falk's dealings with the licensing and with patent prosecution or patent infringement claims, with knowledge of the patent's invalidity. So I take your point that Dr. Falk may not have been involved with the patent office itself, but I don't see how that defeats a false claims act claim for later events. So a patent is entitled to a statutory presumption of invalidity. There is no knowledge of invalidity prior to the adjudication of invalidity. The patent has not been asserted or litigated since those two claims were found invalid. So there's no falsity about asserting a patent that's entitled to a statutory presumption of validity. And moreover, as to the licensing question, all that is in the complaint is a bare reference to Falk being the, or to Salix being the exclusive licensee to the patent. So there's no information sufficient to establish that even as a contact in the United States that would make Falk subject to personal jurisdiction. Thank you, counsel. Mr. Singh, I want to give you a couple more minutes since we've run over time a little bit to make a rebuttal despite the lack of time. So I'll give you a little more time, but not too much. Thank you, Your Honor. So what I would lead with is the point that Mr. Caba made about how we want to add words to the statute. And what he says is we want to add a government party limitation to prong two. That's just emphatically not true. The way we read the statute, the words in it do all the work. The second prong includes the phrase other federal. And we think other is naturally read to mean different from the things that came before. Not just the things in prong two, but the things in prong one as well. In other words, it's not the criminal, civil, administrative or congressional hearings. It's the other federal hearings. And the party limitation applies to the things in prong one and not the things in prong two. What the other side wants to do is take an entire sentence out of the statute, which is prong one. You saw that Mr. Caba, who is an amazing, excellent lawyer, could not give you a single example of a thing that would still be covered by prong one and not prong two under his interpretation. He was unable to provide any substantiation for the idea that they don't render that superfluous. And so I think that's a telling indictment of their interpretation. Pivoting to the Otterbeck patents. Let me ask one question. Isn't it possible that the United States could be a party in a non-federal proceeding if sovereign immunity were waived? But it wouldn't count, Your Honor, because the language of prong one is in a federal criminal, civil, or administrative hearing in which the government or its agent is a party. And so even if the United States was a party in some state court proceeding or international proceeding, I don't think those would count as public disclosures under the statute as written. Just quickly on the Otterbeck patents, I think the only thing to keep in mind is our allegations about this are far from conclusory. We recite the history of how this went. We say generics were ready to enter the market in 2011, and they were challenging and fighting until the 688 patent was granted. And then the very next day, Lupin's dropped its claims and they got an extra period of exclusivity. Any generic that wanted to try to come in, even after the Otterbeck patents would have expired, would have been doing so at risk until the federal circuit affirmed the invalidity of the 688 patent. And they wouldn't have done it. And so if there's a question about whether the defendant's falsehoods caused false claims, that's a fat question that isn't suitable for resolution at the pleading stage, especially when the other side hasn't made that argument in their briefs. Thank you, Your Honor. Thank you. Your Honor, I wonder if it might be possible to make one point for 10 seconds. That is that there has never been generic approvals for this drug. We're aware. Thank you.
judges: SCHROEDER, SANCHEZ, Antoon